**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| **United States of America,** | **Case No.** |
| **v.** | |
| **Xiao-Jiang Li** | |
| **Defendant**. | |

**DEFENDANT'S SENTENCING MEMORANDUM IN SUPPORT OF**
**NON-CUSTODIAL SENTENCE**

Dr. Xiao-Jiang Li, by and through the undersigned counsel, respectfully submits this memorandum in aid of sentencing, and respectfully requests that the Court sentence Dr. Li to a period of one year of probation, pay restitution, and be ordered to file corrected tax returns for the tax years 2012-2018. The government agrees that a sentence at the low end of the Guidelines, which is probation, is appropriate.

Dr. Li has pled guilty to an Information charging him with one count of Making and Subscribing a False Tax Return, in violation of 26 U.S.C. § 7206(1). This charge results from Dr. Li's failure to report income he earned while working part-time in China between 2012 and 2018. Although Dr. Li filed tax returns during those years in which he correctly reported his taxable income earned as a professor at Emory University, the returns failed to disclose additional taxed income Dr. Li earned while working part-time in China. The failure to disclose this income resulted in a stipulated tax loss of $35,089.

Dr. Li deeply regrets this failure on his part.  By agreeing to plead guilty pre-indictment, Dr. Li hopes to demonstrate his acceptance of responsibility for his conduct, and will, as part of his agreement with the government, pay restitution and file amended tax returns for the relevant years.

In light of the sentencing guidelines in this case, as well as the factors set forth in 18 U.S.C. § 3553(a), and for the reasons set forth herein, the defense respectfully submits that one year of probation, with restitution, is an appropriate disposition in this case. Specifically, based on the particular facts of Dr. Li's offense, his pre-indictment plea, and the otherwise unblemished life Dr. Li has led as a scientist, husband, and father, a sentence of probation would be sufficient, but not greater than necessary, to satisfy the sentencing factors set forth in § 3553(a). *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (noting that the objective in sentencing is that it be "sufficient, but not greater than necessary" to meet the ends of justice).

## I.   BACKGROUND

### A.  Dr. Li

Dr. Li was born in Jiangxi province, in China, in 1957. He was one of four children who grew up in a lower-middle-class family. His childhood and education were significantly affected by the Cultural Revolution from 1966-1977, the most difficult period in modern Chinese history. During this time, Dr. Li's father was accused of being a spy on behalf of Taiwan and, as a result, Dr. Li's family lost all rights and opportunities to obtain good employment and education.

In 1977, when China reopened universities and admitted students based on their entrance exams rather than their family backgrounds, Dr. Li was selected to enter Jiangxi Medical College in Nanchang, China, to study medicine. During his five years at university, Dr. Li met his future wife, Shihua Li, whom he married in 1984. Dr. Li continued to study pharmacology, and he

eventually pursued a Master's degree at Suzhou Medical College from 1983-1986, while Shihua remained in Nanchang to complete her residency in internal medicine. After Dr. Li came to the United States to pursue a Ph.D. in pharmacology at Oregon Health Science University in 1987, Shihua arrived in the U.S. the same year, and they started their family and careers here.

Dr. Li's experience in the U.S. epitomized how intelligence combined with hard work can help any immigrant obtain a piece of the American dream. Dr. Li continued his postdoctoral training at Johns Hopkins University School of Medicine from 1991 to 1995 and, in 1996, he was recruited by Emory University School of Medicine to be an Assistant Professor. Since then, Dr. Li and his wife have worked together to find treatments for Huntington's disease, an inherited condition that causes the progressive breakdown of nerve cells in the brain. It deteriorates a person's physical and mental abilities usually during their prime working years and has no cure, and has been described as exhibiting symptoms of someone who has ALS, Parkinson's, and Alzheimer's simultaneously.[1] Dr. Li ultimately obtained U.S. citizenship in 2000, and he and Shihua raised their children, also U.S. citizens, in the Atlanta area until they left for college.

Dr. Li's work on Huntington's disease has been nothing short of ground-breaking.  It was through his work that it was determined for the first time that large animals can serve as better models to study this disease and to find effective treatments. Dr. Li's lab, in collaboration with others, established the first monkey and pig models of Huntington's disease in 2008 and 2010. These large-animal models show the same neuronal loss seen in patient brains, an important pathological change that is absent in small-animal models that had previously been relied upon

---

[1] *See* Overview of Huntington's Disease, Huntington's Disease Society of America, https://hdsa.org/what-is-hd/overview-of-huntingtons-disease/ (last visited Apr. 7, 2020).

by scientists. This important difference explained why many drugs that worked with mouse models failed to treat patients. However, because creating large-animal models in the U.S. is extremely difficult, Dr. Li did much of his large-animal research in China.

Dr. Li eventually established an international collaboration with Chinese scientists. At this time – between 2008 through 2017 – the U.S. encouraged international collaboration in China, and Emory University strongly supported Dr. Li's work by permitting him to establish a lab in China, where he spent up to half his time.

In 2012, Dr. Li established a lab at Institute of Genetics and Developmental Biology at the Chinese Academy of Sciences (CAS) in Beijing, China. As the Principal Investigator, he recruited students and technicians and trained them to work on transgenic, non-human primate models. From 2012 to 2016, he assembled a team using genetic tools to modify monkeys to create monkey models of neurodegenerative diseases. When his contract with CAS ended at the end of 2016, he moved his part-time work in China to Jinan University in Guangzhou, China, a university with outstanding facilities for large animals. Dr. Li continued to travel between the U.S. and China during this time period, when he also had research and teaching obligations at Emory University.

In May, 2019, Dr. Li and Shihua were abruptly fired by Emory University, allegedly for failing to fully disclose his relationships with Chinese Universities.[2] As a consequence of this dismissal, Dr. Li was forced to find full-time employment in China. Since June, 2019, Dr. Li has worked full-time at Jinan University, where he continued to lead a team working on neurodegenerative diseases such as Huntington's and Parkinson's diseases.

_____

[2] Dr. Li is currently contesting his dismissal from Emory, which he maintains was wholly unjustified.

4

Because Dr. Li was arrested on a criminal complaint in late November, 2019,[3] when he returned from China to attend an Emory faculty hearing to contest his dismissal, he has been forced to remain in the United States since that time, unable to work and earn any income to support his family. As a further consequence of both his dismissal from Emory and his arrest on this complaint, Dr. Li has lost his health insurance in the U.S., and has had to forego treatment to address a pressing medical issue for which he has required surgery for months. As part of this plea agreement, the parties are requesting that the Court permit Dr. Li to travel to, and reside, in China, so that he can obtain medical treatment for his health problems[4] and also work and support his family and pay back whatever interest and penalties may be imposed as a result of his failure to report his foreign income.

### B.  Dr. Li's Offense

Although the money Dr. Li earned in China was taxed in China at a rate of 26 percent, this fact did not relieve Dr. Li of his obligation to report this income on his federal income taxes. However, had Dr. Li properly reported his foreign income as required, he would have been entitled to a credit for the taxes he paid in China.  Because Dr. Li was taxed in the United States at a rate of approximately 30 percent – 4 percent more than he was taxed in China – this delta (4 percent) is the amount of tax loss Dr. Li's under-reporting caused the government. All told, the parties have stipulated that the tax loss to the U.S. treasury was $35,089, spread out over seven years.

---

[3] The subject of this criminal complaint pertained to Dr. Li's work at Emory University and funding he received from the National Institutes of Health. The government has agreed that this complaint should be dismissed as part of Dr. Li's plea agreement.

[4] *See* Sealed Ex. A (attaching medical records regarding Dr. Li's health conditions).

Dr. Li will be filing amended tax returns for the relevant years and will pay whatever penalties and interest he owes.

### C.  Sentencing Guidelines Calculation

Both the government and Dr. Li agree that, pursuant to Section 2T1.1 of the Sentencing Guidelines, Dr. Li's offense level based on the loss amount of between $15,000 and $40,000 is 12 (*see* U.S.S.G. § 2T4.1(D) (2018)), which is further reduced by two levels due to Dr. Li's acceptance of responsibility, yielding an adjusted offense level of 10. Dr. Li has no criminal history, placing him in Criminal History Category level I. An offense level of 10 yields a guideline range of 6 to 12 months.

The government has indicated, however, that a sentence at the "low end of the Guidelines" is appropriate in this case, which would be probation. *See* U.S.S.G. § 5C1.1(c)(3) ("If the applicable guideline range is in Zone B of the Sentencing Table, the minimum term may be satisfied by—(3) a sentence of probation"). This is because Dr. Li's guideline range is in Zone B of the Sentencing Table, and he is a nonviolent offender. *See id.*; *see also id.* cmt. 4 ("If the defendant is a nonviolent offender and the applicable guideline range is in Zone A or B of the Sentencing Table, the court should consider imposing a sentence other than a sentence of imprisonment, in accordance with subsection (b) or (c)(3).").

## II.   THE COURT SHOULD IMPOSE A SENTENCE OF PROBATION WITH RESTITUTION.

### A.  The Guidelines are advisory, and the sentence should be no greater than necessary to satisfy the statutory purposes under § 3553(a).

While the Court must determine the applicable Sentencing Guidelines range, *see Molina-Martinez v. United States*, 136 S. Ct. 1338, 1342 (2016), the guidelines are a mere starting point; they are no longer mandatory. *See United States v. Booker*, 543 U.S. 220 (2005). The Guidelines

6

no longer carry the force of law, federal judges are no longer bound to strictly apply them, and "[a] district court may not presume that a Guidelines sentence is reasonable." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). The Guidelines are now purely advisory, and the Court has significant discretion to vary from the Guideline range. *See id.* at 187–88.

Instead of applying the Guidelines as compulsory, the Court has discretion to impose a non-Guideline sentence as long as the sentence is reasonable and justified. *See United States v. Jimenez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (en banc) ("*Booker*'s remedial solution makes it possible for courts to impose non-guideline sentences that override the guidelines, subject only to the ultimate requirement of reasonableness."), *abrogated on other grounds by Rita v. United States*, 551 U.S. 338 (2007); *see also Koon v. United States*, 518 U.S. 81, 96–97 (1996) (determining that a district court is vested with broad discretion to depart from the Guidelines); U.S.S.G. § 5K2.0.

The Guidelines are now but a "starting point and initial benchmark" for sentencing. *Gall v. United States*, 552 U.S. 38, 39 (2007). After calculating the Guidelines range, the Court must then "make an individualized assessment based on the facts presented" by the parties. *Id.* Post-*Booker* sentencing involves two steps—after the first step of calculating the Guideline range, the Court must engage in the second step of considering the § 3553(a) factors to determine a reasonable sentence. *See United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005), *abrogated on other grounds by Rita*, 551 U.S. at 338.

Just as the Court has discretion to impose a non-Guidelines sentence, "the weight to be afforded any § 3553(a) factor is a matter firmly committed to the discretion of the sentencing judge." *United States v. Verkhoglyad*, 516 F.3d 122, 131 (2d Cir. 2008) (quotation marks omitted). Furthermore, the Court has discretion to decide whether any § 3553(a) factor justifies a

downward variance. *See Gall*, 552 U.S. at 51. When imposing a sentence outside the Guidelines range, the Court applies a non-mathematical formula with individualized assessments based on facts presented by the parties. *See id.* at 47, 50.

This Court must be guided by the fact that the ultimate sentence should be "not greater than necessary to accomplish the sentencing goals advanced in § 3553(a)." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

**B.  A sentence of probation, with restitution, is appropriate and consistent with the purpose of § 3553.**

    i.  <u>A sentence of probation, with restitution, is appropriate in light of the nature of the offense and Dr. Li's personal history and characteristics (§ 3553(a)(1)).</u>

Dr. Li is responsible for his conduct. He is embarrassed by it. But this conduct should be viewed in the context of his entire life as a man – as a husband, a father, a professor, and as a scientist working to cure a disease that afflicts millions of people. Dr. Li is a good and decent man, a devoted husband and father, and a highly successful and productive member of the Huntington's disease research community. He poses no threat to society. He is not a danger to reoffend. Incarcerating Dr. Li would serve no societal purpose.

Dr. Li has agreed to pay restitution for the amount of loss the parties agree his conduct caused the government. That restitution amount – $35,089 – will be paid at the time of his sentencing. In addition, Dr. Li has agreed to file amended tax returns for the tax years 2012 through 2018 within two months of his sentencing – provided the Court sentences him to probation.[5]

---

[5] Any sentence of confinement would, of course, necessarily complicate the filing of amended tax returns.

  ii. <u>A non-custodial sentence affords adequate deterrence (§ 3553(a)(2)(B)).</u>

As a result of his pleading guilty, Dr. Li will be a convicted felon. That result is an enormous punishment for a man who has heretofore enjoyed a well-deserved unblemished reputation. Dr. Li has lost his position at Emory University and has been forced to work in China – far away from his family – in order for him to support himself and his family. In sum, this conviction is a painful lesson that Dr. Li will have to endure.

  iii. <u>A non-custodial sentence is warranted because Dr. Li poses no threat to the public (§ 3553(a)(2)(C)).</u>

It is undeniable that Dr. Li poses no risk to the public.

  iv. <u>A non-custodial sentence is warranted because Dr. Li requires no correctional treatment (§ 3553(a)(2)(D)).</u>

Dr. Li does not require any educational or vocational training, medical care, or other correctional treatment that would warrant a custodial sentence, let alone one within the Guidelines range. This supports a sentence without incarceration.

  v. <u>A non-custodial sentence is warranted under the § 3553(a) factors in light of risks related to the current COVID-19 pandemic.</u>

A non-custodial sentence is also warranted because it would avoid exposing Dr. Li to the risk of contracting severe illness from COVID-19.

Prison populations face a heightened risk of exposure to the coronavirus because of the inability to engage in social distancing while confined in close quarters. As a result, numerous inmates have reportedly contracted COVID-19 and become deeply ill. On March 29, 2020, the *Washington* Post reported that an explosion of coronavirus cases crippled one federal prison: "A federal prison in Louisiana has, within days, exploded with coronavirus cases, leading to the death of one inmate on Saturday, the admission of a guard into a hospital intensive care unit, and

positive test results for another 30 inmates and staff."[6]  Five inmates have reportedly died at the

prison since that publication. The Federal Bureau of Prisons ("BOP") has reported at least 28

federal inmate deaths due to COVID-19,[7] though the real number may be much higher. Given

the surge in cases at prison facilities, BOP has been aggressively reviewing inmates for possible

release to home confinement, and is prioritizing those inmates with COVID-19 risk factors.[8] In

addition, federal courts have released inmates due to these risks, including by granting petitions

for compassionate release.[9]

---

[6] Kimberly Kindy, *An Explosion of Coronavirus Cases Cripples a Federal Prison in Louisiana*, Washington Post (Mar. 6, 2020, 10:00 AM), http://www.washingtonpost.com/national/an-explosion-of-coronavirus-cases-cripples-a-federal-prison-in-louisiana/2020/03/29/75a465c0-71d5-11ea-85cb-8670579b863d_story.html%3foutputType=amp

[7] COVID-19, BOP, https://www.bop.gov/coronavirus/ (last visited Apr. 27, 2020).

[8] Update on Home Confinement & COVID-19, BOP, https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp (last visited Apr. 27, 2020).

[9] *See, e.g.*, *United States v. Wen*, 2020 WL 1845104, --- F. Supp. 2d --- (W.D.N.Y. Apr. 13, 2020) (ordering inmate released from home confinement and observing that "all prisons undoubtedly present challenges in terms of promoting social distancing and maintaining the sanitization called for to halt the spread of this disease," and the "pandemic itself is unprecedented in modern history, presenting a clear and present danger to free society for reasons that need no elaboration"); *United States v. McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL 1698732, at *6 (D. Conn. Apr. 8, 2020) (concluding that the defendant "demonstrated extraordinary and compelling reasons justifying his release" in light of his medical conditions and the "risk of severe illness if he contracts COVID-19"); *United States v. Hernandez*, No. 18 Cr. 834-04 (PAE), 2020 WL 1684062, at *3 (S.D.N.Y. Apr. 2, 2020) (granting compassionate release pursuant to 18 U.S.C. § 3582(c) in light of the defendant's heightened risk that the COVID-19 pandemic presents for him due to his asthma); *United States v. Copeland*, No. 2:05-cr-135-DCN, ECF No. 662 (D.S.C. Mar. 24, 2020) (granting compassion release to defendant in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments that defendant has during this current pandemic"); *Xochihua-James v. Barr*, No. 18-71460, ECF No. 53 (9th Cir. Mar. 23, 2020) (*sua sponte* releasing detainee from immigration detention "in light of  the rapidly escalating public health crisis"); *United States v. Campagna*, No. 16-CR-78-01, 2020 WL 1489829, at *3 (S.D.N.Y. Mar. 27, 2020) ("Defendant's compromised immune system, taken in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling reason to modify to Defendant's sentence on the grounds that he is suffering from a serious medical condition that substantially diminishes his

Dr. Li has significant risk factors that could lead to devastating complications or even death if he were to contract COVID-19. He has had high blood pressure for the last three years, for which he takes medication.[10] The CDC has advised that people with hypertension and heart conditions like his are at a higher risk of suffering severe illness from COVID-19.[11] This fact has been widely reported in the press as well.[12] In fact, more than half (55.4%) of patients who died of COVID-19 in New York City had high blood pressure.[13] Dr. Li's age also increases his risk of suffering severe illness from COVID-19, as he is sixty-three years old. Probation is therefore warranted to prevent Dr. Li from contracting COVID-19 and suffering severe health consequences up to and including death. Indeed, if he were sentenced to a term of prison, he

---

ability to provide self-care within the environment of the RCC."); *United States v. Stephens*, 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic"); *United States v. Huneeus*, No. 19-CR-10117-IT-7, ECF No. 642 (D. Mass., Mar. 17, 2020) (granted defendant emergency motion for modification of imposed term of imprisonment for extraordinary and compelling health reasons pursuant to 18 U.S.C. 3582(c)(1)(A)); *United States v. Muniz*, No. 4:09-Cr-0199-1, 2020 WL 1540325 (KPE) (S.D. Tex. Mar. 30, 2020) (finding extraordinary and compelling reasons under § 3582(c)(1)(A)(i) in light of heightened risk to inmate presented by COVID-19); *United States v. Campagna*, No. 16 Cr. 78-01, 2020 WL 1489829 (LGS) (S.D.N.Y. Mar. 27, 2020) (same); cf. *United States v. Perez*, No. 17 Cr. 513-3 (AT), 2020 WL 1546422 (S.D.N.Y. Apr. 1, 2020) (finding extraordinary and compelling reasons under § 3582(c)(1)(A) and waiving requirement of exhaustion of administrative remedies).

[10] Sealed Exhibit A includes medical records evidencing Dr. Li's relevant health conditions that place him at a heightened risk of suffering complications related to COVID-19.

[11] People Who Are at Higher Risk for Severe Illness, CDC https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited Apr. 27, 2020).

[12] *See, e.g.*, Ryan Prior, "Those with High Blood Pressure Are at a Greater Risk for COVID-19," CNN (Apr. 17, 2020), https://www.cnn.com/2020/04/17/health/blood-pressure-coronavirus-wellness/index.html.

[13] *See* Richard Franki, "Comorbidities the Rule in New York's COVID-19 Deaths" (Apr. 8, 2020), https://www.the-hospitalist.org/hospitalist/article/220457/coronavirus-updates-comorbidities-rule-new-yorks-covid-19-deaths.

would likely be a candidate for release by BOP shortly after surrendering himself.

### III.   CONCLUSION

Dr. Li not only has no criminal history; he has no prior *arrests*. There can be no serious suggestion that Dr. Li is at risk to re-offend. A sentence of one year of probation, restitution, and a requirement that he file amended tax returns for the relevant years is appropriate and justified. Such a sentence is no "slap on the wrist." Dr. Li now has a felony conviction on his record, a label that he will be forced to wear for the rest of his life. But this sentence will permit Dr. Li to continue his ground-breaking and vitally needed research into Huntington's disease, which has been widely reported by the media and highly praised by the NIH director,[14] receive treatment for his health problems, and continue to support his family and pay whatever interest and penalties will be due. In short, it is a sentence that would provide a fair and just resolution to this case, and it would accomplish the goals of sentencing set forth in 18 U.S.C. § 3553.

---

[14] Dr. Francis Collins, Huntington's Disease: Gene Editing Shows Promise in Mouse Studies, *NIH Director's Blog*, June 27, 2017, https://directorsblog.nih.gov/2017/06/27/huntingtons-disease-gene-editing-shows-promise-in-mouse-studies/; Gene-Edited Pigs Better Model Huntington's Disease, *Asian Scientist Magazine*, Apr. 6, 2018, https://www.asianscientist.com/2018/04/in-the-lab/crispr-pig-model-huntingtons-disease/; Animal model of Huntington's offers advantages for testing treatments, *Drug Target Review*, Apr. 2, 2018, https://www.drugtargetreview.com/news/30830/animal-model-huntingtons/.

Dated: May 6, 2020                                    Respectfully submitted,


                                                      */s/ Peter Zeidenberg*
                                                      Peter Zeidenberg, Esq. (*pro hac vice*)
                                                      ARENT FOX LLP
                                                      1717 K Street, NW
                                                      Washington, DC 20006
                                                      Tel.: (202) 857-6000
                                                      Fax: (202) 857-6395
                                                      peter.zeidenberg@arentfox.com

                                                      *Attorney for Xiao-Jiang Li*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6th day of May, 2020, I electronically filed the

foregoing with the Clerk of Court via email with a copy to all counsel of record.


*/s/ Peter Zeidenberg*
Peter Zeidenberg, Esq.